The Honorable Judges of the United States Court of Appeals in and for the 7th Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this honorable court are admonished to draw near and give their attention, as the court is now sitting. God save the United States and this honorable court. Good morning, ladies and gentlemen. Our first case for argument this morning is Cook County v. Bank of America. Mr. Peck. Good morning, and may it please the Court. Robert Peck on behalf of Cook County. The district court made a fundamental error conflating the persuasiveness of the conclusions of the county's experts and their credibility with its obligation as a gatekeeper to look at the relevance and reliability of the methodology. And this carried over throughout the opinion, affecting the other decisions that the court made. I'd like to start with the bivariate quantitative analysis that Dr. Gary Lacefield did. A bivariate analysis is a regression analysis. It looks at two different factors to determine whether there is an association or not and results in a correlation that can be tested and looked at and determine basically whether or not that association exists. This is what he did. And what the court said was that nobody uses that analysis, but this is a very common type of analysis. And it's one that, as the record demonstrates, he was taught when he was an examiner at HUD that he used when he was at HUD, that it was validated by his co-expert, Dr. Cowan, who only had not heard of the word deliminator used in that context, which actually is exactly the same thing as the factors, the focal points, as it's termed in the Interagency Procedures Manual, which also basically supports his approach. And even another fact witness later, his former supervisor, Joseph Eubanks, confirmed that this was the method taught and used at HUD. The banks expert, Marsha Courchene, also confirmed that this was a viable kind of analysis, but she said it had been used since 2004. Of course, the Interagency Procedures Manual that was entered into the record, which also endorses this, was dated 2009. So that seems to suggest that it has been used much more recently. And the difference between a bivariate and a multivariate analysis is that a multivariate analysis can dig in deeper, basically find subsets within the overall category that help explain where the relationships exist. So can you tell me, though, Mr. Peck, whether—I mean, I had thought the district court wasn't making a fundamental mistake in using the Frye test instead of Rule 702 or anything like that. I thought that the district court was concerned about the utility of this analysis for the trier of fact, you know, kind of a different part of Rule 702. And I just have trouble reading what she said as just saying, well, is it generally accepted? Well, we all know that that went by the way of the dodo, you know, some time ago, but she just doesn't think that Dr. Lasefield was looking at things that were useful. She does say that, but if you look at footnote 12 of her summary judgment opinion, she says that there is no evidence that this is generally accepted as a methodology. And so I think she does use the Frye test mistakenly instead of the more— So we're just going to pick that one word out of her whole explanation? Well, I think that it's part of what she describes in terms of this methodology. She constantly looks like, well, who else uses it? Well, it's not necessary that someone else use it, although that is the case. We've confirmed that it is used widely. She doubts the conclusions and works backwards from there. And that's what we think is the fundamental error here. And so if you look at that, you find that, you know, she's wondering about whether or not there's anyone else who uses this methodology. And the test is really whether this is one that's appropriate to the discipline, relevant and reliable. And the fact that it was used by the government, whether it's used today or not, still testifies to its relevance and reliability, even if there are better methods. Because of course, when experts clash like this, there is one that says my method is better than the other, and that's why my conclusions are better. And that's a battle of the experts that's very classic on this. She also questions whether or not he used similarly situated comparatives. And we show that he did, and he testified that he did. He used FICO scores, loan to values ratios. Counsel, let me come back to what I take to be the burden of the district court's opinion, which is that it just doesn't matter. Given the Supreme Court's conclusion in Miami, why does any of this matter to the outcome? Well, I think that it's very important to look at what the city of Miami did, which I had the privilege of arguing in the Supreme Court. And in the city of Miami, the court confirmed that we're following precedent, the Gladstone decision, the Havens decision. And those decisions, it acknowledged, said that there was a direct injury. That was on the scope of liability part though, and then the court goes on to say that it's going to impose a very strict proximate, indeed the dissenter said, is anybody ever going to qualify? And here we are finding that out. But it was the proximate cause, which I thought was what the district court was concerned about. There are lots of steps in this process between what the banks are doing and what finally happens in the market. I beg to differ on that, because one of the gist of, one of the causes of action is the foreclosure itself. The foreclosures themselves were discriminatory. There's no extra steps between that. But on top of that- Well, for Cook County though, I mean, the immediate people hurt by the foreclosures, I should imagine, are the people who live in the house. Right? I mean, Cook County, the court identifies some things. Maybe there were 12 extra people, I think, hired or assigned the task of- But they also diverted resources by shifting people to different things. Under Havens, that is an injury that's compensable. But in addition, let me go back to Miami and what it's- Well, I think the facts- I was surprised to find that your brief didn't even mention the Oakland case. I do think it's wrong, first of all, and it was a unanimous panel decision that it overturned. And it also disagrees- The final decision in Oakland, 11 to nothing. Yes. And let me explain why- And adverse to your position. Let me explain why it's- So I had expected that you would discuss it. And, Your Honor, I was not involved in the briefing at the opening stage, and I can't answer why it wasn't discussed, but I can explain it right now. And that is, first, what the court made clear both in City of Miami and the Holmes case on which it relied, which was a RICO case, is that proximate cause is statute-specific. And so we look, for example, at the Lexmark case. Well, that's why Oakland comes into the picture, because it is, and that's one of our sisters. But they did no examination, as Holmes requires, of the legislative history. The previous panel that they vacated did. And what the Supreme Court did in City of Miami is look to the 1988 amendments to the Fair Housing Act, where it said that what Congress did was endorse Gladstone and Havens, endorsed it for saying that there is an injury here that a municipality, in that instance, here a county, suffers when there is this kind of discrimination. And then what it says is, but you have to then look at what is administratively convenient and feasible as determining what the first step is. So they don't talk about a literal first step. There's a different kind of first step depending on the nature of the statute in Lexmark. Let me ask you this, because this is one thing that I think is maybe critical to this case and also critical to the proper application of the Miami decision. You can break anything down into a large number of little pieces. And I want to know, what's the unit that makes the first step? Your argument is that it's just this vast plan on the part of Bank of America to cause these foreclosures, and I think thereby you must be arguing enrich itself and so on, and that a victim, as recognized in the first part of the Miami decision of that plan, is Cook County done. Well, it seems to me your opponents are saying, no, wait a minute, there are meaningful steps. It's not just one great big lump of a first step. It's the decision to foreclose, and it's the loss of the house, and it's the consequent deterioration of the neighborhood, and all sorts of things like that. Right. And let me say one thing. Oakland was about the origination of loans, so there were many more steps in the Oakland case. But where I differ with the Ninth Circuit, and what I think is not explained by them, is that under their reading of proximate cause, no municipality, no county can ever bring such a case, because only the borrower has the kind of injury that the FHA recognizes. Why is that unusual? I mean, statutes confer rights of action on some people, and others take the antitrust laws. If you're a shareholder of a corporation, or if you're an employee, I mean, from associated general contractors, you're not the right person to sue. But except that in this case, what the, I'm pointed to the fact that we did cite the city of Oakland in our reply brief. But what, I'm sorry, your question again. My point was that it is not, so even if the correct result here is that at least on the basis of these facts, Cook County is too remote from the injuries that you're talking about. I'm saying that's a routine consequence in statutory construction. It is a routine consequence, and the Supreme Court applied that in Title VII, but rejected that with respect to the FHA. And I gave you the example of associated general contractors, which is the antitrust laws, where they draw some lines, who gets to enforce and who doesn't. Right, but they rejected it with respect to the FHA on the standing holding of City of Miami. And they recognized that those 1988 amendments found that the FHA had been underutilized because of restrictions on its standing. So when Congress made a determination, it was broadening standing, because very few people will recognize the kind of injury that they're suffering on an individualized basis and be able to bring this kind of case. So they wanted to encourage, because the Justice Department was not doing it, they wanted to encourage parties to do so. And they approved of that kind of broad standing. And how could Congress agree that standing would lie with a county or a municipality, and then say, but you still don't meet the proximate cause standard? That doesn't make much sense, and it's somewhat irrational. And I would commend to this Court the persuasive authority of the remand decision from the Eleventh Circuit that talks about it. Which was vacated by the Supreme Court. It was vacated, but it still has persuasive power. No, it has no authority. It's kind of like a law review article. Now if you think a law review article is enough, but it has no judicial authority. That's what the vacator for mootness is all about. With respect, courts have relied on vacated decisions for all sorts of propositions. And while they recognize it has no precedential power, it does still have persuasive power. And I would suggest that the analysis there is very strong about why what often is described as multiple steps are not multiple steps. And when you talk about the decision... And I want to know the principled way that we decide under this statute which are the steps that count. Right. And what I'm saying is that just like Lexmark, where it found no discontinuity, where there was a one-to-one relationship between the action and the injury. The same thing exists here, because it's not the decision to foreclose, but it is the foreclosure itself that is the discriminatory act after having stripped equity over all this time. And so therefore, this is one continuous act in which they then become the plaintiffs. As Dr. Cowan's report shows, he matched up the bank's data with the foreclosure docket with census data to show that what happened here was a discriminatory type of foreclosure that results in an immediate impact on the county in terms of the cost that it now had to bear and diversion of resources, as in Havens Federal, and then also from the property tax losses that result, because every foreclosure automatically means that there is a loss of property. So that one-to-one relationship with no discontinuity, no intervening events, is a first step. I see that I'm almost at the time I'd like to reserve for a rebuttal of five minutes, so unless there's any other questions at this point, I'll reserve the rest of my time. Certainly, Mr. Peck. Mr. J. Thank you, Your Honor. May it please the Court. I'd like to make three overarching points. One is to the point Judge Easterbrook brought up in the top half of the argument. We do think that the case could be resolved entirely on proximate cause grounds. Second point is that if you affirm the district court's exclusion of the experts, that would certainly dispose of the disparate impact claim without more. And then the third point, I think, goes to Judge Wood's colloquy with my friend in the top half, which is, what is the unit? And I think it's important to note that the county, over the course of this litigation in the district court, and even this morning, has been shifting back and forth between whether the supposed discriminatory act is the act of foreclosure or the act of originating the loans. All of their expert evidence, certainly all of Dr. Cowan's expert evidence that my friend referred to, it's all about origination. It doesn't look at foreclosure at all. We submit they don't have any evidence of discriminatory foreclosure, which is why the causal chain, just like in the city of Oakland, is a long and winding one in this case. It is not remotely within the first step. So because the first and third kind of both circle back to proximate cause, I would like to begin there. But on proximate cause, the one thing that seemed to give the district court pause, and me too, is that the county, these weren't the big ticket items, but the county pointed to quite direct effects on its own operations, whether it was the need to assign personnel to this, whether it was the fact that it was deprived of tax revenues because of the actions of the bank. And I'm not terribly persuaded that, you know, about overall taxes. If the pie is growing, there would have been more taxes. So I think there's a real effect there. Why are those not quite direct consequences of what the bank was doing? Well, right back to your original question about what is the unit, and what you just asked is, if the question is what was the bank doing, remember that all of their liability evidence points to originations. Dr. Cowan, for example, doesn't even look at servicing. He doesn't look at foreclosure. His opinion is just that if a loan was discriminatory in the terms on which it was originated, that any foreclosure was therefore discriminatory. So correct me if I'm wrong, I thought that one of the things about Dr. Cowan that you were complaining about, as a matter of fact, was that he was looking at a pool that included banks other than your client, and that also was looking at both originations and servicing and sort of lumping a lot into his analysis. So two points, Your Honor. One is about the pool, and the other is about what variables he looked at. So on the first point, the pool, he looked at every loan that was serviced by any of the defendant entities at any time after 2009. Right, so serviced, not just originated. Correct, and that was the problem, because he lumped in tens of thousands of loans that were originated by someone else and eventually were serviced by one of the defendant entities. But all of the testing that he did is about supposed discrimination in origination. He did not, for example, establish that foreclosure itself was discriminatory. What he said was he draws conclusions about foreclosure based on his conclusions about origination, but he consciously does not look at any of the many variables, and this is back to your point about our conversation about the causal chain, in between origination and foreclosure. Many things happen in between origination and foreclosure, and the most significant of which, which Dr. Cowan did not test for at all, is that someone might lose their job. Their income might change. They might suffer a health crisis or have some other impact on their assets, and he does nothing at all to look at whether a loan that was not in any way risky when made might nonetheless lead to foreclosure based on changes in the borrower's individual terms. So I think that—I want to get to the thrust of your question about the foreclosure processing damages, but it's important to recognize that the county is not really making a claim, as my friend said this morning, about the discriminatory foreclosures. All of their liability evidence is about origination. Of course, the experts were properly excluded, on our view, and then they— His view is that you set them up to fail. That's their theory, that the loans were set up to fail, in other words, but— You're equity stripping. That's their view. Right. That's the theory that they pleaded, but as the district court explained, they never established any kind of integrated scheme, or I think the term that the other side used was single scheme between origination, servicing, and foreclosure, because to this point, this pool of loans includes loans that were foreclosed on by people other than Bank of America or Countrywide. It includes loans that were originated by people other than Bank of America or Countrywide. So it's just not probative of a single integrated plan that begins with origination and concludes with foreclosure, even if there were some way for the bank to make money out of foreclosure. Let's take the situation where we agree with you on the experts. They're out. Looking simply at the other circumstantial evidence in the case of intent, what's missing? So what they have pointed to in their briefs is evidence that—and let's bracket proximate cause, of course, because you just asked me about intent, and you'd still have to show damage and proximate cause. They've pointed to evidence that Countrywide, in particular, which hasn't existed since 2007, had a program to market loan products to minorities. They have not pointed to any evidence of discrimination in the terms or even the offerings that Countrywide made available. Is that right? Because I thought they were saying that similarly situated borrowers who had the same credit scores and that sort of thing were getting higher interest, more prepayment penalties, more onerous terms in the loans that they were getting. I thought that was an allegation. So I think that was an allegation in the complaint. I mean, Judge Ripple's question asked me to assume a way there—assume that the experts were properly excluded. And I don't think that they have any documentary evidence on the point that Your Honor is making and the expert evidence on that point is fundamentally flawed for the reasons I think that we've already touched on. But I think it is important to note that they have gone through some documents and they've identified some PowerPoints and some marketing materials and so forth. But none of those suggest that the terms of loans or other financial products were made available on a discriminatory basis. Assume for me, if you will, again, since you and I are assuming things here, that there is sufficient evidence of discriminatory intent. And we do get to the causation question. I'm particularly worried, as Judge Wood indicated, she apparently has some reservations about the whole issue of tax base. I don't—that argument is made and accepted by the remand court in the Eleventh Circuit, and I understand that's been vacated, but it still is rather persuasive or could be Why doesn't that wash? It doesn't wash for three reasons, and I'll go through them one by one. The first is just our previous colloquy, yours and mine, a moment ago, where you asked about discriminatory intent. We're still talking about origination. What they don't have at all is evidence of discriminatory foreclosure per se. So if you look at paragraphs 19 and 20 of our Statement of Facts and the county's response, you'll see that they respond entirely by pointing to the experts and saying that there's a disparate impact on foreclosures. They don't have any evidence of discriminatory foreclosures at all. So just to button that up from our prior conversation. Second is on the—I want to be careful to distinguish between the tax point and the other foreclosure processing damages, because the district court dismissed the claim for But that is exactly the kind of claim that was litigated in Oakland, as well as in Miami. That is the point that our friends made in their reply brief, that Oakland is a claim for tax damages, and we don't think—I mean, look, ultimately, you would have to agree either with the en banc decision in Oakland or with the vacated decision in Miami. You can't agree with both. They're irreconcilable with each other. We don't think that you should create a circuit split and disagree with the Ninth Circuit, basically because, as the Ninth Circuit explained, the tax damages are not, in any sense, automatic from foreclosure. My friend said that basically the diminution in value from foreclosure is automatic, and that is simply not correct. Number one, they have no evidence of that in this case. They have a declaration that cites two journal articles, both of which are about the effect on neighboring properties, not about the effect on an actual foreclosed property. So, in other words, they don't have evidence that there's an automatic diminution in value every time—of the subject property every time there's foreclosure. And it's important to recognize that. I mean, that seems like a very counterintuitive statement to me, that when a property is foreclosed and now it's empty and it's going to be appraised by an objective market appraiser at the same level before and after. So, it's the, and now it's empty point that I think exactly put your finger on it, Judge Wood, which is that there are variables besides the foreclosure that are contingent variables that you would have to look at in order to establish why a property lost value and what the cause was, because foreclosed properties may or may not sit vacant. And then this is the point that I was getting to a moment ago, that the county is trying to recover here for damages not just to the tax base from properties foreclosed upon. Their theory is much broader. They're also trying to recover for diminution in value of neighboring properties, and they've drawn, you know, they've put a little compass on each foreclosed property and have tried to claim the diminution in value within a certain radius. That's something that could be sorted out at trial, right? We don't think so, Your Honor, because ultimately this is not within the first step, and there is no reason why the Fair Housing Act should be construed to allow municipalities to bring this kind of claim, because this is the kind of claim that can readily be litigated not only by the borrowers themselves, but also by the enforcing authorities. The district court at one point indicated it was unimpressed with the tax base diminution because it was the aggregate tax base of the county was not diminished. That argument struck me as somewhat off point, because the fact of the matter is if this hadn't happened, the tax base actually of the county would have increased. The fact of the matter is if their case holds water, the growth of the tax base was retarded. What the district court, what we go through in our papers and what is not dealt with in Miami at all is how the actual tax revenue is assessed, so separate and apart from the tax base. The county commissioners in Cook County set each year an amount of revenue that they want to bring in, and then based on the levy that they set, the county clerk figures out what millage rate to apply to subject properties. So in other words, and tax revenue was stable over the relevant period of time. So in other words, in this counterfactual world where there have been no foreclosures and the tax base was higher, there's every reason to conclude that the county commissioners would simply have set the level of revenue that they've set. That means a lower tax rate for taxpayers, but it does not mean less money for the county. Your hypothesis that you've just spun out, and it's in your briefs of course, suggests that there are no constraints on the Cook County commissioners when they come up with this number. And there are actually very strong political constraints as to, that they don't just sort of sit around and say, we'd like, you know, X dollars this year, because they may get significant blowback, they may be not reelected, I mean, it's not just sort of a freebie. I agree with that entirely, and that actually makes our proximate cause point for us, I think, because it's not an automatic one-to-one, as my friend said, trying to capitalize on an automatic one-to-one correspondence between property value of foreclosed property or neighboring properties goes down, county gets less money in the bank. That's not a one-to-one correspondence, for exactly the reason you and I are talking about now. That's why it's not within the first step, the county's assessment of its properties is a separate step, I think, from how much money the county brings in, for exactly that reason, that there are other considerations the commissioners must and do take into account. So that's the tax point, and then the damages that the district court allowed to go forward on the two-summary judgment were the separate category of damages based on the actual processing of foreclosures, which are different, and, I mean, just two points on that. One is that the district court explained that she had allowed that claim to go forward based on the county's representation that it was going to show a single or integrated equity stripping scheme whereby the discrimination reaches all the way forward from origination to foreclosure. And we see schemes like that all the time, and, you know, wire fraud cases, other kinds of things, where there are individual steps, but it's being driven by, you know, the desire to complete the equity stripping. That is why the district court let this go forward, to see if the county could substantiate it with evidence, and it did not, as she said, as Judge Bucklow said in her decision. So is your basic position that equity stripping would be a foolish money-making strategy for the bank anyway? I just have been wondering about that. I think our basic position, because where they've focused on foreclosures is that there's not money to be made in causing properties to be foreclosed upon. That is our basic submission, because they have not shown an integrated equity stripping scheme that we could respond to on the merits, but I think that that basic point that banks make money by originating and servicing loans. They don't make money by foreclosing on properties. Foreclosure is levying on collateral. Collateral protects loans. Protects the loan. Right, exactly, and it allows banks to offer loans at a lower rate than an unsecured loan. But they make their money by lending. And so just to finish the point on foreclosure processing damages, we think ultimately that even if this were a case about foreclosure discrimination and the claim were that these damages resulted directly from the foreclosures, as I said, they haven't shown that on the merits. They also haven't shown evidence of foreclosure processing damages on the merits. In other words, they have not proved up that theory, because what they have not shown is that each foreclosure imposes a marginal cost. What the damages that they're trying to recover under the heading of foreclosure processing damages include such things as a share of the salary of the county commissioners. And they say that this is justified because, well, without all this overhead, we couldn't process foreclosures, therefore you owe us a share of the overhead. But the overhead doesn't change the number of people assigned, like the number of employees of the sheriff's department, for example, did not increase. They didn't go out and hire new sheriff's deputies. What they've never shown is- But that's their Havens theory. They're saying diversion of resources is enough. They are saying that diversion of resources is enough, but just a couple of points about that. One, just that on the merits, they didn't actually show diversion of resources from- certainly not on any programmatic level. So we're really just talking about within individual offices that some employees are doing one job and more of one job and less of another. The only thing that they've pointed to on a sort of a- as a tangible diversion of resources is the mortgage foreclosure mediation program that they set up. And there's no evidence that that was caused by a response to discriminatory foreclosures. It was just a response to the increase in foreclosures, full stop. And the second point is that there's every reason to believe that that is a cost that the county invested in- a program that the county invested in. It had a cost. It is not a marginal cost that corresponds to each- for which you could claim each additional foreclosure caused the mediation program to be more expensive on a marginal dollar basis. That is the evidence that they ultimately don't have, that individual foreclosures cost the county 15 cents- each individual foreclosure cost the county 15 cents more or anything like that, because that is not how the county set up its case. It's not how it organizes its finances. And ultimately, that's why these aren't recoverable on the merits. But- and even more fundamentally, even if you disagree with me on that, the fact that they're trying to put premise liability on origination and damages on foreclosure, that is one of two reasons why their causal chain is too long to recover under a correct application of the Supreme Court's City of Miami decision. Unless the Court has any further questions. Thank you, Your Honors. Thank you. Thank you. Anything further, Mr. Pack? I'd like to make some corrections about the record. First of all, the property taxes that the county alleged that they lost was dismissed at the motion to dismiss stage. So my friend's explanation that there's no evidence to support it is, of course, true because you don't introduce evidence at the motion to dismiss stage. And instead, there are reasonable inferences that the foreclosed properties lost value. And that there is indeed a one-to-one ratio, because if the county does nothing to mitigate the loss of revenue in terms of property taxes, doesn't change the rate, doesn't assess other property taxes on those properties. And that cannot be doubted at the motion to dismiss stage. In addition, the types of damages that we might claim in terms of foreclosures, that's a fact question. It's not something that is subject at this point to the summary judgment stage. And that's something that, you know, if we've over-claimed for overhead but not for the employees who are paid under a separate budget in a different part of the county to help out on this crisis of foreclosures, then that is, under Havens, a compensable action. What about Mr. Jay's point about basing the liability on originations and the damages on foreclosures? Well, that's another thing that I think he got wrong. There is a separate cause of action in our complaint for foreclosures. We claim that there's discrimination in the foreclosures. And another thing that is wrong, both our experts started at the foreclosure stage and looked at it from that point. And as I explained earlier, they took the data that the banks gave us, they went through the foreclosure docket, they matched people up. And where they didn't have enough information, they used census data. And so they were able to say that these were discriminatory foreclosures, and there is indeed the one-to-one ratio that Lexmark approved of. And so there's no discontinuity, and the claim that they only addressed liability at the origination stage just doesn't pan out if you look at those expert reports. In addition, we did not rely solely on gross disparities in terms of intentional discrimination. Those disparities were pretty gross. They were nearly four-to-one. But we also pointed to specifics like the House America Loan Program, which was targeted by Bank of America's admission at minority borrowers, and designed with these consumers in mind to allow less-than-normal standard guidelines for when we gave out loans. So these were high-risk loans approved on nontraditional credit, pooled funds, border income, and even when the borrower did not have the funds for the down payment or the closing cost. So how good was the data showing, holding constant creditworthiness? You just said they were high-risk loans, and I've seen other cases where banks have been sued for not lending to minorities and others, and I'm wondering, what's the middle ground they're supposed to steer? I missed the last one. Well, I want to be sure that on your side, your experts have properly controlled for the creditworthiness of the buyer and all of these other circumstances. Is somebody's income stream okay? What's their asset for collateral? Not only did Dr. Lacefield say that he looked at FICO scores, loan-to-value income ratios, so those are traditional things, but the fact is also, Dr. Cowan said, based on his own knowledge and experience of these banks, when they take over a loan, either purchase a loan or decide to service a loan, they undertake the same underwriting standards and risk assessment that they do when they originate a loan. And so therefore, we know that that issue of whether there's a job loss, there's health care concerns and things like that, that's baked into their analysis. And so it doesn't change when you are similarly situated and get a higher risk or higher cost loan, or when you essentially have your equity stripped of your home and there is a foreclosure. So all of that is part of it, and it's integrated in the same way that you described. There may be multiple steps, and the strategies may have changed from time to time to account for new economic realities, but the objective was always the same. And so for that reason, we think that the district court should be reversed. Thank you to both counsel. The case is taken under advisement.